UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVONTRAE JAURICE BENTON,

       Petitioner,

                                     Civil Case No. 15-12855
v.                                    Honorable Linda V. Parker

NOAH NAGY,[1]

          Respondent.
_____/

## OPINION AND ORDER GRANTING PETITION
## FOR WRIT OF HABEAS CORPUS

     Davontrae Jaurice Benton ("Petitioner") has filed a petition for the writ of

habeas corpus under 28 U.S.C. § 2254.  Through counsel, Petitioner challenges his

convictions in Michigan state court for second-degree murder in violation of

Michigan Compiled Laws § 750.317, four counts of assault with intent to murder

in violation of Michigan Compiled Laws § 750.83, and possession of a firearm

during the commission of a felony in violation of Michigan Compiled Laws

§ 750.227b.  Petitioner sets forth two claims in support of his request for habeas

relief: (1) the trial court violated his fundamental rights by withdrawing his nolo

---

[1] Petitioner currently is incarcerated at the Lakeland Correctional Facility in
Coldwater, Michigan.  The Court is sua sponte amending the case caption to reflect
the name of the warden at that facility, as required by Rule 2 of the Rules
Governing § 2254 Cases.

contendere plea and his trial counsel was ineffective for agreeing to proceed to trial

without first discussing the decision with Petitioner; and (2) Petitioner was denied

his right to remain silent based on the testimony of a police sergeant, who testified

on his decision to remain silent.  Respondent has filed an answer in opposition to

the petition.

## I.     Factual and Procedural Background

Petitioner's convictions arose from a shooting on November 1, 2010, which

resulted in the death of six-year old Janaries Holden.  The Michigan Court of

Appeals described the facts underlying Petitioner's convictions as follows:

> Defendant's convictions arise from a November 1, 2010,
> shooting incident in the city of Flint in which a gunshot was fired into
> a vehicle driven by Johnny Holden and occupied by five other
> persons. According to testimony at trial, defendant was upset with
> Holden for failing to pay a drug debt. Witnesses testified that
> defendant was driving an Impala and pulled alongside a Monte Carlo
> that Holden was driving. After defendant demanded his money and
> Holden told defendant that he did not have it, defendant swerved his
> vehicle in front of the Monte Carlo in an effort to stop it. Defendant
> then said "Bye" as he fired a gunshot that struck and killed Holden's
> six-year-old son, who was in the backseat. Cell phone data indicated
> that after the offense, defendant drove from Flint to the Detroit area.
> Two days later, defendant, accompanied by his attorney, turned
> himself in to the police.

*People v. Benton*, No. 310249, 2014 WL 1778372, at *1 (Mich. Ct. App. May 1,

2014).  These facts are presumed correct on habeas review.  *See* 28 U.S.C.

§ 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009).

## A.     Charges and Plea

The November 1, 2010 incident led to Petitioner being charged in Genesee County Circuit Court with one count of homicide open murder, four counts of assault with intent to murder, and one count of felony firearm.  Attorney Kenneth Scott represented Petitioner during the criminal proceedings.  Early in the representation, Petitioner instructed Attorney Scott to negotiate a plea agreement on his behalf.

A *Killebrew* agreement[2] was reached pursuant to which Petitioner agreed to plead nolo contendere to manslaughter, the prosecutor agreed to dismiss the remaining counts against him, and the parties agreed that Petitioner's sentence would be within the guidelines range of twenty-nine (29) to fifty-seven (57) months.[3]  On January 19, 2012, Petitioner pleaded no contest pursuant to that agreement.  Sentencing was scheduled for February 21, 2012.

## B.     Withdrawal of the Plea and Trial

At the scheduled sentencing hearing, the trial judge indicated that he could not go along with the terms of the *Killebrew* agreement.  The trial court further

---

[2] A *Killebrew* agreement allows a defendant to enter a conditional guilty plea, which can be withdrawn if the judge ultimately sentences above the agreed upon terms. *People v. Killebrew*, 330 N.W.2d 834 (Mich. 1982).

[3] Petitioner pleaded no contest as opposed to guilty because of the civil liability he potentially faced as a result of Janaries' death.  (*See* 1/19/12 Hr'g Tr. at 7, ECF No. 6-13 at Pg ID 458.)

stated that he would depart upwards from the guidelines and sentence Petitioner to a term of imprisonment of ten (10) to fifteen (15) years, based on the presentence report, the victim's age, and the circumstance of the shooting. The court then asked Petitioner and Attorney Scott to indicate whether Petitioner wished to go along with that sentence or proceed to trial, to which Petitioner's trial counsel immediately responded, "Give us a trial date." (2/21/12 Hr'g Tr. at 19, ECF No. 6-14 at Pg ID 480.)

At that point, Attorney Scott requested that Petitioner be released on bond, which the Court denied. (*Id.* at 20-21, Pg ID 481-82.) The prosecutor reinstated the previously dismissed charges against Petitioner (one count of open murder, four counts of assault with intent to murder, and felony firearm). (*Id*.) The trial court then gave the parties a March 20, 2012 trial date. (*Id*. at 23, Pg ID 484.)

Petitioner's jury trial in fact began four weeks later, on March 20, in the Genesee County Circuit Court. On March 30, 2012, the jury found Petitioner guilty of second-degree murder, four counts of assault with intent to murder, and four counts of felony firearm. Petitioner's sentencing was held on April 26, 2012. After his allocution, Petitioner informed the court that he never rejected his plea and never gave his attorney consent to withdraw the plea. (4/26/12 Tr. at 17, ECF No. 6-25 at Pg ID 2274.) The trial court informed Petitioner that it could not enforce the plea because he had already been convicted. (*Id*. at 18, Pg ID 2275.)

The trial court then sentenced Petitioner to concurrent prison terms of thirty-one years and three months to fifty years on the second-degree murder and assault with intent to murder convictions, and a consecutive two-year term of imprisonment for the felony firearm conviction. (*Id*. at 23-24, Pg ID 2280-81.)

## C. Post-Conviction Proceedings

Petitioner filed a direct appeal through counsel, but then moved to remand to raise an ineffective assistance of counsel claim related to the withdrawal of his nolo contendere plea. The Michigan Court of Appeals granted the motion, with the following instruction:

> [T]he matter is remanded to the trial court so that defendant-appellant may move to vacate his convictions and reinstate his nolo contendere plea. The trial court shall conduct an evidentiary hearing on the issue of ineffective assistance of counsel and rule on the motion to vacate the convictions.

Order, *People v. Benton*, No. 310249 (Mich. Ct. App. Feb. 7, 2013) (ECF No. 6-27 at Pg ID 2498.)

Petitioner thereafter filed a motion to vacate his convictions in the trial court. The trial court held an evidentiary hearing on April 3, 2013. (4/3/13 Hr'g Tr., ECF No. 6-26.) Attorney Scott and Petitioner testified at the hearing. (*Id*.)

Attorney Scott testified that Petitioner told him to negotiate a plea agreement on his behalf, and that the plea agreement subsequently was reached. (*Id*. at 5, Pg ID 2291.) Between January 19, 2012—the date Petitioner entered his nolo

contendere plea—and the February 21, 2012 sentencing hearing, Attorney Scott did not talk to Petitioner about his case because "there was nothing to talk about." (*Id*. at 16-17, Pg ID 2302-03.)

Attorney Scott indicated that he received a call from the trial judge's chambers before the scheduled sentencing date, asking that he arrive at the courthouse early for the hearing because the judge wanted to first meet with him. (*Id*. at 12-13, Pg ID 2298-99.) According to Attorney Scott, he in fact arrived late to the courthouse for the sentencing, but still went to chambers. (*Id*.) At that time, the trial judge told Attorney Scott that he "was going to sentence at the top end of the guidelines." (*Id.* at 6, 12-13, 17, Pg ID 2292, 2298-99, 2303.) Attorney Scott testified that the sentencing hearing was the first time he learned that the judge was not going to sentence Petitioner within the guideline range, but was going to impose a sentence of ten to fifteen years: "I never knew or thought of or fathomed that he was going to go outside of the guidelines until I walked into Court." (*Id.* at 17, 19, Pg ID 2303, 2305.)

Attorney Scott testified that he did not have an opportunity to speak with Petitioner before they went on the record on February 21. (*Id*. at 6, 18, Pg ID 2292, 2304.) In any event, Attorney Scott testified that the only thing he would have discussed with Petitioner—which already had been relayed to him—was that the judge might sentence him to a minimum sentence at the top of the guideline

range, as there had been no communication that the judge was going to sentence him outside that range. (*Id.* at 19-20, Pg ID 2305-06.) As Attorney Scott explained further, he never discussed with Petitioner the possibility that the judge could exceed the guidelines and impose a sentence of ten to fifteen years because "that was not part of the agreement, so why would I discuss that with him?" (*Id.* at 14-15, Pg ID 2300-01.)

Attorney Scott did not ask Petitioner if he wanted to withdraw his plea after the trial court announced that he was going to sentence Petitioner outside the guideline range. (*Id.* at 7, Pg ID 2293.) Attorney Scott did not recall having any discussion with Petitioner at the February 21 hearing, except to say that he would come see Petitioner. (*Id.* at 22, Pg ID 2308.) Attorney Scott could not recall when he next spoke to Petitioner. (*Id.* at 25, Pg ID 2311.) However, as Attorney Scott was scheduled to be in two murder trials in the coming weeks, he put Petitioner's "case on the back burner[.]" (*Id.*)

In the meantime, Attorney Scott recalls that Petitioner called his office and Petitioner's mother came to his office on several occasions attempting to meet with him. (*Id.* at 31, Pg ID 2317.) When Attorney Scott and Petitioner did speak, Petitioner asked whether the plea was still available. (*Id.* at 28, Pg ID 2314.) According to Attorney Scott, Petitioner asked him about the plea more than once. (*Id.*) Petitioner also asked Attorney Scott why he told the judge they were going to

trial, and told Attorney Scott that he wanted to take the ten-to-fifteen-year sentence. (*Id.* at 30, Pg ID 2316.) Attorney Scott specifically recalled Petitioner expressing his willingness to do ten years because he would still be home to see his daughter graduate. (*Id.*) Attorney Scott advised Petitioner that the plea was still available and would be even up to the time of trial. (*Id.* at 37, Pg ID 2323.) Attorney Scott did not go to the prosecutor with Petitioner's request until the end of the trial, however, and at that point the prosecutor said the offer was no longer available. (*Id.* at 34, Pg ID 2320.)

Petitioner testified that he requested that his attorney negotiate a plea agreement in his case. (*Id.* at 49, Pg ID 2335.) It was Petitioner's desire to plead to manslaughter instead of going to trial. (*Id.* at 50, Pg ID 2336.) According to Petitioner, Attorney Scott visited him at the jail the Friday before the scheduled sentencing hearing, informing Petitioner that "we have a problem with the plea." (*Id.* at 67-68, Pg ID 2353-54.) Attorney Scott told Petitioner, however, that he did not know what that meant and all he could tell him was "that the Judge said that his back is against the wall with the Benton plea." (*Id.*) Attorney Scott indicated that he could not contact the court until Tuesday to find out more. (*Id.*)

Before the hearing began the following Tuesday, February 21, 2012, Attorney Scott visited Petitioner in lock-up to review Petitioner's presentence report. (*Id.* at 50, 68, Pg ID 2336, 2354.) Petitioner asked Attorney Scott what the

judge said about the plea, and Attorney Scott told Petitioner the judge was going to sentence him to the top of the guidelines, which was fifty-seven months. (*Id*.) Petitioner testified that he was then "shocked" when the judge announced at the hearing that he was going to sentence Petitioner to ten years. (*Id*. at 68, Pg ID 2354.) Petitioner further testified: "However, I was still gonna accept it [the plea]. He [Attorney Scott] didn't even give me a chance to accept it. He just blurted out, 'Give me a trial date.' You know, he had me in the blind the whole time." (*Id*. at 68-69, Pg ID 2354-55.)

According to Petitioner, Attorney Scott had not consulted him and they had no discussion prior to that point about withdrawing the plea. (*Id.* at 51, Pg ID 2337.) Petitioner stated that he leaned over and tried to speak to his attorney and ask him what he was doing, but Attorney Scott would not say anything. (*Id.* at 56, Pg ID 2342.) Petitioner testified:

> He [Attorney Scott] just looked straight-faced at the Judge; and, you know, they always told me don't blurt out in Court … so I'm trying to do the proper courtroom etiquette … and still try to talk to my lawyer at the same time, but he wouldn't say nothin' to me. And the proceedings went by so fast; and when I'm leavin' out, I'm telling him to come see me.

(*Id.*) When the judge asked if Petitioner "wish[ed] to go along with [the ten-year sentence] or "go forward to trial," Petitioner believed inquiry was directed to his attorney. (*Id.* at 54, Pg ID 2340.) When asked if he would have chosen to

withdraw the plea, Petitioner answered: "No, I was always accepting my plea." (*Id*.)

Petitioner believed Attorney Scott was going to come see him after the hearing, but he did not. The following day, Petitioner called Attorney Scott to find out why he withdrew the plea. (*Id.* at 51, Pg ID 2337.) Petitioner testified that he called his attorney numerous times and even had family members go to his office to ask him to come see Petitioner. (*Id*.) Petitioner indicated that it took Attorney Scott three weeks—the week before Petitioner's trial began—to come see him. (*Id*.) At that time, Petitioner asked his attorney if the plea was still available and Attorney Scott advised that "the plea offer was still there." (*Id*. at 52, 60, Pg ID 2338, 2346.)

Petitioner testified that he repeatedly asked Attorney Scott to check with the prosecutor to see if Petitioner could plead to manslaughter, including at the start and throughout the trial. (*Id*. at 52, Pg ID 2338.) Petitioner did not recall being in court between February 21 and March 20.[4] (*Id*. at 59, Pg ID 2345.) When asked why he did not speak up during the trial about his desire to re-enter the plea, Petitioner explained:

---

[4] Attorney Scott testified that he was back in court on Petitioner's case between the February 21 hearing and the March 20 trial date; however, he could not recall if Petitioner was in court or if his presence had been waived. (4/3/13 Hr'g Tr. at 34, Pg Id 2320.)

… the reason I didn't speak up is 'cause when I asked my lawyer to retrieve my plea, he said just sit back, we still have time. So I was giving him time to go get my plea, you know; so a day or two later … I ain't know how the, uh—how long it was gonna take them to work it out … All I know is I was referring my wish—my wishes to my lawyer and let him follow through and do the proper procedures of what needs to be done …

(*Id*. at 53, Pg ID 2339.) Plaintiff later added:

I felt that I had no reason to – to confront the Judge, since my lawyer—I still had my lawyer present and my lawyer was telling me that the plea was still available. So I was gonna let my lawyer go ahead and grab my plea for me, 'cause he knew the proper way to do it … I didn't know the proper way to do it.
…
I thought he [Attorney Scott] was talking to the prosecutor; that he had to go through the prosecutor and not the Court. … That's what I thought, so I didn't—I didn't know whether he was talking to him [the prosecutor] …

(*Id*. at 61, 63, Pg ID 2347, 2349.)

According to Petitioner, between the February 21 hearing and the start of trial, he and Attorney Scott did not discuss the strength of his case or the likelihood of Petitioner being convicted or acquitted. (*Id*. at 60, Pg ID 2346.) Before Petitioner entered the plea, Attorney Scott told him that it was "fifty-fifty" between the strength of his defense and the prosecutor's case. (*Id*.) Petitioner did not recall preparing for trial with Attorney Scott. (*Id*. at 59, Pg ID 2345.) According to Petitioner: "He just told me that I had to go to court and to have my family get me some trial clothes." (*Id*.) Attorney Scott testified that there were some problems

11

for Petitioner's defense created by the short notice between the plea withdrawal and trial. (*Id*. at 28-29, Pg ID 2314-15.)

At the conclusion of Attorney Scott's and Petitioner's testimony, the trial judge stated on the record that he was taking "judicial notice" that his secretary called Attorney Scott's office the Friday before the February 21, 2012 scheduled sentencing date, instructing "Attorney Scott to see Mr. Benton to make him aware that the Court could not go along with the plea agreement[.]" (*Id*. at 71, Pg ID 2357.) The trial judge then indicated that he wanted to review the video of the February 21 hearing at which Petitioner's plea was withdrawn before issuing his ruling.

After reviewing the videotape, the trial court denied Petitioner's motion. (2/21/12 Hr'g Tr. at 82-95, ECF No. 6-26 at Pg ID 2368-81.) In its ruling, the trial court took further "judicial notice" that when his secretary called defense counsel's office the Friday before the sentencing date, she talked directly to Attorney Scott. (*Id*. at 82, Pg ID 2368.) The trial court also indicated that the videotape of the hearing did not reflect Petitioner attempting to speak with his attorney after learning that the court would depart from the guidelines:

> Mr. Benton stood right next to Attorney Scott and actually leaned his head away from Attorney Scott. He didn't lean towards Attorney Scott. He didn't tug at Attorney Scott's shoulder. He didn't have any facial expression whatsoever that would evidence any surprise.

(*Id*. at 87, Pg ID 2373.)  The trial judge also found that Petitioner was listening when the victim's mother was asked during the sentencing hearing whether she would want to see the case proceed to trial if the court could not go along with the sentencing agreement.  (*Id*. at 88, Pg ID 2374.)

Following the trial court's ruling, Petitioner filed an appeal with the Michigan Court of Appeals, raising the following claims:

I.    The trial court violated his fundamental rights by withdrawing his nolo contendere plea without his consent;

II.   Ineffective assistance of trial counsel;

III.  The trial court erred by denying his motion to adjourn on the first day of trial;

IV.   Sergeant Brett Small gave unresponsive testimony that infringed upon Petitioner's post-arrest right to remain silent;

V.    The prosecutor elicited impermissible drug profile testimony;

VI.   Prosecutorial misconduct; and

VII.  The trial court erred by failing to instruct the jury on the elements of self-defense.

*Benton*, 2014 WL 1778372.  The appellate court affirmed Petitioner's convictions. *Id*.  Thereafter, Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims.  The Michigan Supreme Court denied the application for review.  *People v. Benton*, 854 N.W.2d 896 (Mich. 2014).

Petitioner also filed a motion for reconsideration, which the Michigan Supreme

Court likewise denied. *People v. Benton*, 861 N.W.2d 889 (Mich. 2015).

Petitioner then filed the instant petition for habeas relief.

## II.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

establishes the standard for federal courts to review a state prisoner's habeas

claims.  28 U.S.C. § 2254(d).  AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' [the Supreme Court's] clearly

established law if it 'applies a rule that contradicts the governing law set forth in

[Supreme Court cases]' or if it 'confronts a set of facts that are materially

indistinguishable from a decision of [the Supreme] Court and nevertheless arrives

at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-

16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas

court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of [the] petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. … The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

To obtain relief under § 2254(d)(2), the petitioner must establish an "unreasonable determination of the facts in light of the evidence presented" *and* "that the resulting state court decision was based on that unreasonable determination." *Rice v. White*, 600 F.3d 242, 250 (6th Cir. 2011). A federal habeas court may consider only "the record that was before the state court that adjudicated the claim on the merits" when evaluating an AEDPA claim. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). AEDPA requires a federal habeas court to presume the correctness of state court factual findings unless they are rebutted by clear and convincing evidence. *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1).

This means that "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Wood*, 558 U.S. at 301). Moreover, AEDPA "gives federal habeas courts no license to redetermine the credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). As such, the state court's findings on the credibility of witnesses are entitled to great deference. *Felkner v. Jackson*, 562 U.S. 594, 598 (2011); *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (citations omitted). A decision based on a credibility determination "will not be overturned on factual grounds *unless* objectively unreasonable in light of the evidence presented in the state court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (emphasis added).

Nevertheless, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Id*. at 340. As the Supreme Court explained: "A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual

premise was incorrect by clear and convincing evidence." *Id*. "If a state court's finding rests on thin air, the petition will have little difficulty satisfying the standards for relief under § 2254." *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000). The same is true where the state court's fact-finding process was fundamentally flawed or defective in some material way. *See Hurles v. Ryan*, 752 F.3d 768 (9th Cir. 2014).

## III. Petitioner's Ineffective Assistance of Counsel Claim

The Court begins and ends with Petitioner's ineffective assistance of counsel claim because it holds that he is entitled to relief based on this claim.

### A. Applicable Law

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during their criminal proceedings. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). This right extends to the plea-bargaining process, during which defendants are "entitled to the effective assistance of competent counsel." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012). The Supreme Court established the test for evaluating ineffective assistance of counsel claims in *Strickland v. Washington*, 466 U.S. 668 (1984), which applies equally to the plea-bargaining process. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985).

There are two components to the *Strickland* test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland*, 466 U.S. at 687. "When a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel during plea bargaining, [the Supreme Court's] cases require that the federal court use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt*, 571 U.S. at 15 (citing *Pinholster*, 563 U.S. at 181). "[R]ather than simply examining whether counsel satisfied *Strickland*'s deferential standard, we ask 'whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard.'" *Carter v. Bogan*, 900 F.3d 754, 773 (6th Cir. 2018) (emphasis in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

When evaluating counsel's performance under *Strickland*'s first step, the reviewing court must apply a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. Courts should "not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors." *Pough v. United States*, 442 F.3d 959, 966 (6th Cir. 2006) (internal quotation marks and citation omitted). The

18

Sixth Circuit has provided guidance for reviewing counsel's performance when a defendant challenges counsel's conduct during plea bargaining.

Although "[t]he decision to plead guilty—first, last, and always—rests with the defendant, not his lawyer … the attorney has a clear obligation to fully inform [his or] her client of the available options." *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003). Counsel has the "paramount" duty to "ensure that the client's decision [whether or not to waive a constitutional right, such as the right to trial] is as informed as possible." *Miller v. Straub*, 299 F.3d 570, 580 (6th Cir. 2002). "A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available." *Smith*, 348 F.3d at 553. "A failure to provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance." *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003) (citing *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001)). "'[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty.'" *Purdy v. United States*, 208 F.3d 31, 44 (2d Cir. 2000) (quoting *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998)). A lawyer "should

usually inform the defendant of the strengths and weaknesses of the case against him[.]" *Id.*

*Strickland*'s prejudice prong requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The Supreme Court has indicated that "prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Lafler v. Cooper*, 566 U.S. 156, 168 (2012). And the Sixth Circuit recognizes that a substantial disparity between the plea offer and the post-trial sentence provides evidence that the defendant would have accepted the plea. *Smith*, 348 F.3d at 552; *Magana*, 263 F.3d at 551-52. The defendant's conduct and statements during plea negotiations may be relevant to prejudice. *See, e.g., Magana*, 263 F.3d at 552. In *Lewandowski v. Makel*, 949 F.2d 884 (6th Cir. 1991), where the defendant pled nolo contendere and then withdrew the plea based on the asserted ineffective assistance of his counsel, the court found the fact that the defendant had entered the plea to be "probably the strongest objective evidence supporting [his] testimony" that he would have taken a plea. *Id.* at 889.

## B.    State Court's Decision

The Michigan Court of Appeals rejected Petitioner's ineffective assistance

of counsel claim related to the withdrawal of his nolo contendere plea, reasoning:

> In this case, the record indicates that defense counsel was
> advised four days before the scheduled sentencing in February 2012
> that the trial court was unlikely to accept the plea agreement and that
> defendant met with defense counsel and was told that there was a
> problem with the plea agreement.  The trial court considered this
> evidence, as well as defendant's background and demonstrated ability
> to speak on his own behalf, as he had done during allocution at the
> February 2012 sentencing proceeding, to find that defendant did not
> speak up when defense counsel asked for a trial date after the court
> announced that it was unable to abide by the sentence agreement,
> because defendant had already decided to go [to] trial if the court
> would not impose a sentence within the guidelines range.  Giving
> deference to the trial court's assessment of the credibility of the
> witnesses and the weight to be accorded the evidence, the trial court's
> finding was not clearly erroneous.  Because the trial court did not
> clearly err by finding that defense counsel's withdrawal of
> defendant's plea was done with defendant's consent, it follows that
> defense counsel's conduct was not objectively unreasonable.

*Benton*, 2014 WL 1778372, at *5.  The Michigan Court of Appeals also rejected

Petitioner's claim that trial counsel was ineffective by erroneously advising

Petitioner that he could still plead to manslaughter at any time before the jury

returned its verdict and by waiting too long to ask the prosecutor to reinstate the

plea agreement.  *Id.*  The trial judge had discredited Petitioner's testimony and

found that he never "made a specific request of [defense counsel] to get him the

plea agreement and not continue this trial." (4/3/13 Hr'g Tr. at 94, ECF No. 6-26 at

Pg ID 2380.)  The appellate court found the trial judge's finding "not clearly erroneous."  *Benton*, 2014 WL 1778372, at *5.

### C.    Analysis

Despite affording Attorney Scott the benefit of the doubt and substantial deference to the state court, this Court must conclude that the state courts' decisions were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings."  *Id*.  Further, clear and convincing evidence rebuts crucial state court factual findings.  Petitioner therefore is entitled to habeas relief on his ineffective assistance of counsel claim pursuant to § 2254(d)(2).

### 1)    Defense Counsel's Performance

This Court begins by addressing the evidence introduced through "judicial notice" by the state trial court.  The facts found by the trial court through "judicial notice" are not the type usually allowed to be introduced through this mechanism. *See* Mich. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); Fed. R. Evid. 201(b) (same).  No doubt, the violation of a state evidentiary rule is not typically grounds for habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Nevertheless, the evidentiary hearing was fundamentally flawed due to the trial court's impermissible importation of facts into the record based on its and its secretary's conduct and their untested memories. *See Hurles*, 752 F.3d at 791 (finding the state-court's factual findings fundamentally flawed and not entitled to § 2254(e)(1)'s presumption of correctness where the state judge based factual findings on her untested memory and understanding of the events); *Tyler v. Swenson*, 427 F.2d 412, 415-16 (8th Cir. 1970) (finding the petitioner's due process rights violated by the trial judge interjecting his own recollection of the events surrounding the petitioner's guilty plea during post-conviction proceedings); *see also In re Murchison*, 349 U.S. 133 (1955) ("Thus the judge whom due process requires to be impartial in weighing the evidence presented before him, called on his own personal knowledge and impression of what had occurred in the grand jury room and his judgment was based in part on this impression, the accuracy of which could not be tested by adequate cross-examination."). As the Eighth Circuit stated in *Tyler*:

> We think it runs against the grain of fairness to say that the same judge may consider his own crucial testimony and recollection rebutting petitioner's claim and simultaneously pass upon the credibility of all witnesses in weighing the evidence. A member of the judiciary has no peculiar competence in factual recollection of unrecorded events.

427 F.2d at 415.

The trial judge also made factual findings based on its review of the video recording from the February 21, 2012 hearing. Specifically, the trial judge concluded that Petitioner was not surprised when the Court pronounced its intended sentence because Petitioner leaned his head away from Attorney Scott, did not lean towards him, did not tug on Attorney Scott's shoulder, and did not have any facial expression whatsoever.[5] (2/21/12 Hr'g Tr. at 87, ECF No. 6-26 at Pg ID 2373.) The trial judge also found that Petitioner "was standing there listening" when the victim's mother was asked if she would want the case to go to trial "if the court could not go along with the sentencing agreement." (*Id*. at 88, Pg ID 2374.) The trial court further concluded from its review of the videotape that Petitioner never turned to defense counsel and said anything after being informed that the court would sentence above the guideline range. (*Id*. at 90, Pg ID 2376.) The Michigan Court of Appeals concluded that the video recording of the February 21, 2012 hearing supported the trial court's findings. *Benton*, 2014 WL 1778372.

In fact, such findings cannot be made from the recording.[6] The February 21, hearing lasted twenty-three minutes and thirty-two seconds. (ECF No. 11.) The video camera pans around the courtroom throughout the duration of the

---

[5] This Court questions whether body language is properly relied upon to evaluate whether a plea withdrawal was informed and knowingly made.
[6] The video recording was not included in the Rule 5 materials filed by Respondent. At the Court's request, it was filed in the traditional manner on October 9, 2018. (ECF No. 11.)

proceedings, focusing on an individual only when he or she speaks (although

Petitioner is usually visible when Attorney Scott speaks as they were standing

together at the podium).  Petitioner and Attorney Scott are shown in the recording

for *a total of <u>two minutes and fifteen seconds</u>*.  The camera is fixed on the trial

judge when the ten-year intended sentence is pronounced and, notably, the trial

judge is looking down and reading from notes except when Petitioner and Attorney

Scott are asked if Petitioner wants to go along with the sentence or proceed to trial.

Petitioner and Attorney Scott are in the recording for the brief second (10:16:28-

10:16:29) it takes Attorney Scott to state: "Give us a trial date."  For the next

fourteen seconds, the camera is focused on the trial judge.  (10:16:29-10:16:44.)

For the remainder of the video recording, Attorney Scott is engaged in a

conversation with the trial judge regarding bond, the court provides a trial date, and

then Petitioner is removed from the courtroom by deputies.

  The video recording fails to reflect what Petitioner said or did or what

expressions he may have had on his face for *the twenty-one minutes and seventeen*

*seconds* that he does not appear in the camera's view.  Again, the camera is

focused on the trial court when it states its intention to sentence Petitioner to a ten-

year minimum sentence on the manslaughter charge.  Thus, the video recording

does not reveal how Petitioner reacted when that information was announced.[7]
Instead, such findings had to have been based on the trial judge's untested
recollection of events that occurred more than a year earlier. This Court presumes
that the state court participated in many cases, involving numerous criminal
defendants, between the time of Petitioner's plea withdrawal and his post-
conviction evidentiary hearing, which likely clouded the court's vivid recollection
of the details in Petitioner's case.

What is equally troubling is that the trial court relied on its untested memory
of the events to assess the credibility of Petitioner and Attorney Scott—the only
individuals in a position to know what Petitioner in fact was told about the judge's
intended sentence, what advice Petitioner received with respect to the decision he
faced, and whether Petitioner in fact made the decision to proceed to trial before
the February 21, 2012 proceedings began. In fact, there is not a shred of
admissible evidence that: (1) Attorney Scott knew the trial court was going to
exceed the guidelines and sentence Petitioner to ten years prior to the judge's
pronouncement to that effect on the record; (2) Attorney Scott conveyed anything
to Petitioner before the hearing other than there was "a problem" with the plea
agreement; (3) Attorney Scott advised Petitioner of the crucial information

---

[7] Contrary to the state court's finding on post-conviction review, there was
absolutely no evidence that Petitioner was informed of the trial court's intended
sentence before it was stated on the record on February 21, 2012.

Petitioner needed to make an informed decision; or (4) Petitioner made a decision to proceed to trial before the proceedings began. As such, the state court's contrary findings were unreasonable.

Even if it was proper to accept the facts mined by the trial court from the extra-record sources of information, those facts established at most that the court's secretary called Attorney Scott the Friday before the scheduled sentencing, spoke directly to him, and conveyed that the trial judge "could not go along with the plea agreement." There is no evidence in the state court record that Attorney Scott was specifically told that the judge was going to exceed the guidelines and, if so, by how much. More importantly, this evidence proves nothing with respect to what Attorney Scott then told Petitioner. At most the state court record shows that, before the February 21, 2012 hearing, Attorney Scott conveyed to Petitioner that there "was a problem with the plea" and that neither Petitioner nor his attorney knew what this meant.

Because the clear and convincing evidence reflects that neither Attorney Scott nor Petitioner knew what the problem was with the plea, there could have been no discussion between Attorney Scott and Petitioner prior to the hearing as to whether Petitioner wanted to withdraw his plea in the face of a ten-year sentence. Further, there is no evidence in the record from which to conclude that Attorney Scott provided the advice Petitioner needed to knowingly and intelligently decide

if he wanted to withdraw the plea and proceed to trial. Specifically, the state court record fails to reflect—and in fact the state courts failed to find—that Attorney Scott advised Petitioner that a withdrawal of the plea would result in the reinstatement of the dismissed charges (including open murder), what potential sentences he faced if found guilty on those charges, or the strengths and weaknesses of the case against him at that stage of the proceedings. In other words, it is "stark and clear," *see Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008), that Attorney Scott did not give Petitioner "'the benefit of counsel's professional advice on th[e] crucial decision' of whether to plea guilty." *Purdy*, 208 F.3d at 34 (quoting *Boria*, 99 F.3d at 497).

The state court also relied on Petitioner's failure to voice his objection to the plea withdrawal at the February 21, 2012 hearing and throughout his trial to conclude that he already decided to withdraw the plea and go to trial if the court imposed a sentence outside the guideline range.[8] *Benton*, 2014 WL 1778372. However, because there is no evidence that Attorney Scott sufficiently advised Petitioner in connection with the decision whether to withdraw his plea or proceed

---

[8] Although not included in the Michigan Court of Appeals' reasoning, the state trial court relied on Petitioner's testimony that Attorney Scott gave him a fifty-fifty chance of prevailing at trial to conclude that Petitioner "had decided to take his chances at trial." (4/3/13 Hr'g Tr. at 89, ECF No. 6-26 at Pg ID 2375.) Petitioner testimony reflects, however, that Attorney Scott conveyed those odds to him *before* he decided to accept the plea to manslaughter. (*See id.* at 60, Pg ID 2346.)

to trial, that silence is irrelevant. Petitioner could not make an informed and knowing decision where his attorney failed to provide critical advice and information in connection with that decision. Thus Petitioner's silence means nothing.

Moreover, mere silence when there is no duty to speak generally does not estop a person from asserting a position later. *Wiser v. Lawler*, 189 U.S. 260, 270 (1903) ("To constitute an estoppel by silence there must be something more than an opportunity to speak. There must be an obligation.") *Codell v. Am. Sur. Co.*, 149 F.2d 854, 856 (6th Cir. 1945). The Sixth Circuit has held a defendant bound by the statements he or she made or failed to make only when *in response to* the court's inquiry, such as during the plea colloquy process. *See Ramos v. Rogers*, 170 F.3d 560, 565-66 (6th Cir. 1999). But where Petitioner was not independently asked to state whether he wanted to withdraw the plea or proceed to trial, his silence and reliance on his counsel speaking for him is not evidence that he made a knowing and intelligent choice to withdraw the plea.

In fact, Petitioner did not remain silent concerning his desire to reinstate his plea to manslaughter. *Within a day* of Attorney Scott withdrawing the plea, Petitioner attempted to reach counsel for an explanation of why the plea was withdrawn and to have it reinstated. Petitioner called Attorney Scott's office numerous times and even had family members attempt to reach him. When

Petitioner was finally able to communicate with his attorney—notably, only a week before his trial began—Petitioner repeatedly instructed him to get the plea reinstated. Petitioner testified that he did not speak up in court because he believed his attorney was working with the prosecutor to reinstate the plea and was relying on his lawyer to follow the proper procedures to pursue his wishes.

For all these reasons, this Court concludes that the clear and convincing evidence rebuts the state court's factual determinations and that the state court's holding that Petitioner's trial counsel was not ineffective was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### 2) Prejudice

The state court did not address *Strickland*'s prejudice-prong. As a result, this Court's "review is not circumscribed by a state court conclusion" and the deferential standard of review mandated by AEDPA does not apply. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *see also Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). Instead, this Court must assess whether Petitioner suffered prejudice as a result of his counsel's ineffectiveness *de novo*. *Maples*, 340 F.3d at 436.

*Strickland*'s prejudice-prong "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Lockhart*, 474

U.S. at 59. "In other words, to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would [not have insisted on going to trial and would have pleaded guilty]." *Id*.

Petitioner unequivocally testified that he wanted to plead to manslaughter and not go to trial. "'Although some circuits have held that a defendant must support his own assertion that he would have [pleaded guilty] with additional objective evidence, [the Sixth Circuit Court of Appeals] ha[s] declined to adopt such a requirement." *Smith*, 348 F.3d at 551 (quoting *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003)) (additional citations omitted). Petitioner's assertions are bolstered by objective evidence, however. Petitioner already entered a plea of nolo contendere. Moreover, the record reflects that it was Petitioner who instructed defense counsel to pursue a plea agreement and he made that request early in the proceedings.

Further, the Sixth Circuit has adopted the view that a petitioner's own credible testimony that he would have accepted a plea combined with a disparity between the sentence offered and the sentence actually received establishes a reasonable probability that the petitioner would have accepted the plea. *Smith*, 348 F.3d at 551-52 (citing cases). Here, Petitioner faced a sentence of ten to fifteen years with the plea. He was sentenced after trial to a prison term of thirty-one and a half to fifty years. The Sixth Circuit and other circuits have found much less

significant disparities sufficient to conclude that a plea would have been accepted but for counsel's ineffective assistance. *See, e.g., Magana*, 263 F.3d at 552-53 (finding the difference between a ten- and twenty-year sentence significant); *United States v. Gordon*, 156 F.3d 376, 377-81 (2d Cir. 1998) (holding that the wide disparity between the ten-year sentence recommended by the plea agreement and the seventeen-and-a-half years the defendant did receive was objective evidence that a plea would have been accepted).

For these reasons, this Court holds that Petitioner satisfies *Strickland*'s prejudice prong.

## IV.    Remedy

Having concluded that Petitioner received ineffective assistance from his counsel in connection with the plea withdrawal and that Petitioner was prejudiced by counsel's errors, the Court turns to the proper remedy. The Supreme Court has advised that "Sixth Amendment remedies should be 'tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.'" *Lafler*, 566 U.S. at 170 (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)). "Thus, a remedy must 'neutralize the taint' of a constitutional violation, while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution." *Id*. (internal citations omitted).

"The only way to effectively repair the constitutional deprivation [Petitioner] suffered is to restore him to the position in which he would have been had the deprivation not occurred[.]" *Lewandowski v. Makel*, 949 F.2d 884, 889 (6th Cir. 1991) (devising a remedy after finding that the petitioner received ineffective assistance of counsel in connection with the withdrawal of his plea to second-degree murder, leading to his conviction for first-degree murder). This means reinstating the nolo contendere plea to manslaughter offered by the prosecutor and accepted by Petitioner and enforcing the sentence the trial court stated he would impose for that conviction—that is a minimum of ten years or a hundred and twenty months and a maximum of fifteen years or a hundred and eighty months, with jail credit of four hundred and seventy-five days. (2/21/12 Hr'g at 19, ECF No. 6-14 at Pg ID 480.) The charges for which Petitioner was convicted after trial and the resulting sentences are vacated.

## V.    Conclusion

In summary, the Court concludes that Petitioner is entitled to the writ of habeas corpus under § 2254 based on his ineffective assistance of counsel claim. The Court therefore finds it unnecessary to address Petitioner's claims that the trial court violated his fundamental rights by withdrawing the nolo contendere plea without obtaining Petitioner's express consent and that the police sergeant's testimony violated Petitioner's right to remain silent.

Accordingly,

**IT IS ORDERED** that Petitioner's application for the writ of habeas corpus

pursuant to 28 U.S.C. § 2254 is **GRANTED**.

s/ Linda V. Parker_____

LINDA V. PARKER

U.S. DISTRICT JUDGE

Dated: November 20, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, November 20, 2018, by electronic and/or
U.S. First Class mail.

s/ R. Loury_____

Case Manager